UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


AVN CORPORATION,

        Plaintiff,

v.                         Civil Action No. 2:23-CV-00149


RESEARCH TECHNOLOGIES,
LLC and RODMAN EGGEN,

        Defendants.


MEMORANDUM OPINION AND ORDER


        Pending is plaintiff AVN Corporation's Motion for Summary Judgment ("AVN's Mot. Summ. J.")(ECF No. 48); defendant Rodman Eggen's Motion for Summary Judgment ("Eggen's Mot. Summ. J.")(ECF No. 52); and defendant Research Technologies LLC's Motion for Summary Judgment ("RT's Mot. Summ. J.")(ECF No. 54), all filed on January 27, 2025. Responses and replies have been filed with respect to each of these motions. ECF Nos. 63-64, 67-70.


I. PROCEDURAL BACKGROUND


        This case arises out of a contract entered into on February 25, 2021, between Mid-Atlantic Technology, Research & Innovation Center ("MATRIC"), which is a now-defunct West Virginia 501(c)(3) corporation, and Research Technologies, LLC, ("RT") a Texas limited liability company. See Compl. ECF No. 1 at ¶ 2.

The plaintiff, AVN Corporation ("AVN"), a West Virginia corporation, on January 1, 2023, became a successor in interest to MATRIC and the due holder by assignment from MATRIC of MATRIC's claims against RT. Id. at ¶ 2.

According to the complaint, MATRIC conducted chemical process research and development. Id. at ¶ 9. Defendant RT is a Texas limited liability company that sought professional services from MATRIC related to research and development of chemical processes. Id. at ¶ 10. Defendant Rodman Eggen is the Director of Engineering for RT and owns 50% of the stock in RT. See Eggen's Response at Interrog. No. 2, Ex. A, ECF No. 52-1.

On February 25, 2021, Eggen as Director of Engineering and acting on behalf of RT, entered into a Master Services Agreement ("MSA") and Statement of Work #2021-01 ("SOW") (collectively, the "services agreement") with MATRIC under which MATRIC agreed to complete confidential work for and to be paid by RT. See Compl. ECF No. 1 at ¶ 10. The SOW projected that the project ("Phase 1") would require three and a half months to complete for an estimated total cost ranging between $210,000 and $245,000. SOW at 18.

MATRIC commenced performance under the contract and invoiced its fees and expenses to RT. Id. at ¶ 19. RT made four payments to MATRIC between May 6, 2021, and June 26, 2021, amounting to $42,320.15. See RT's Answer and Resp. to Pl.'s Disc. Req., June

20, 2024, Ex. R, ECF No. 68-3. However, after June 26th, RT ceased making payments on the invoices submitted by MATRIC for the services already performed. <u>See</u> Compl. ECF No. 1 at ¶ 22. Sometime thereafter, MATRIC assigned its position under the contract to AVN and ceased to exist. <u>Id.</u> at ¶ 27.

AVN, in its two-count complaint against RT and Eggen, asserts a claim in Count I against both RT and Eggen for breach of contract. <u>Id.</u> at ¶¶ 32-33. In Count II AVN asserts a claim against Eggen for fraudulent inducement. <u>Id.</u> at ¶¶ 34-38. AVN seeks judgment in the amount of $243,978.05, plus interest at 1.5% per month, for outstanding invoices, as well as attorney's fees, costs, and any other relief available. <u>Id.</u> at ¶ 39(a)-(d).

RT in its answer set forth a two-count counterclaim against AVN. In Count I RT alleges that MATRIC breached the contract by failing to "timely and appropriately complete the research at issue." <u>See</u> RT's Answer and Defenses, January 15, 2024, ECF No. 9. In Count II RT asserts that MATRIC tortiously interfered with RT's contractual relationship with Dakota Gasification Company ("Dakota Gas" or "DGC"). <u>Id.</u> RT seeks judgment in actual damages for lost profits and other consequential damages, plus interest, as well as attorney's fees, costs, and any other relief available. <u>Id.</u>

AVN in seeking summary judgment asserts that (1) RT and Eggen breached the services agreement when they failed to pay MATRIC for outstanding invoices; (2) Eggen, who is described by AVN as an officer and Managing Member of RT, fraudulently induced MATRIC to enter into the services agreement knowing that RT was without funds to pay for the services to be rendered; (3) RT's counterclaim for breach of contract claim fails because (a) RT's corporate privileges to bring a claim were forfeited under Texas Tax Code § 171.252, (b) there was no guarantee by MATRIC of any specific results from the project, and (c) RT's counterclaim requires expert testimony that RT has not provided; and (4) RT's counterclaim for tortious interference fails because MATRIC did not tortiously interfere with RT's "contractual relationship" with Dakota Gas as there was no existing contract between RT and Dakota Gas at the time of the alleged interference. See AVN's Mot. Summ. J.

In his motion for summary judgment Eggen alleges that (1) AVN's breach of contract claim against him fails because he is not a party to the contract, and (2) there is no evidence that he made any false or material statements meant to induce MATRIC into entering into the services agreement with RT. See Eggen's Mot. Summ. J.

RT alleges in its motion for summary judgment that (1) AVN cannot establish its breach of contract claim against RT because MATRIC itself failed to perform under the services agreement, (2) MATRIC's failure to perform constitutes a breach of contract, and (3) MATRIC tortiously interfered with RT's relationship with Dakota Gas by failing to perform and by engaging in communications with Dakota Gas about a potential project. See RT's Mot. Summ. J.

## II. FACTUAL BACKGROUND

On June 15, 2019, RT and Dakota Gasification Company, a North Dakota Corporation, entered into a Memorandum of Understanding ("MOU"). See Memorandum of Understanding, Ex. 1, ECF No. 48-1 (pp. 12-14). Dakota Gas produces and markets a crude naphtha and tar oil overhead products, along with other chemicals and products, at its plant ("Dakota Gas Plant"). Id. The MOU recites RT and Dakota Gas's proposal to conduct discussions regarding a potential processing agreement in which RT "would further the research conducted to date and build a processing unit to hydro-treat and reduce sulfur, nitrogen compounds, certain metals, and oxygenates from Dakota Gas's naphtha such that the resulting product could be sold..." Id.

The MOU sets forth the relationship of the parties noting that "this MOU is not a binding offer on the part of Dakota Gas

and is only intended to provide a starting point for potential future negotiations." Id. The purpose of the agreement as set forth in the MOU is:

> The Parties hereby agree that, in the event that both Parties seek to undertake a long term offtake agreement for the sale and purchase of DGC naphtha and DGC tar oil overheads, the terms and conditions set forth in this MOU will serve as a starting point for the negotiations between the Parties.

MOU, ¶ 5.

Prior to the signing of the MOU, RT and Dakota Gas agreed that Dakota Gas would submit a proposal for financial support to finance "in part, RT's research and development." See RT v. Dakota Gas Compl., Ex. 1, ECF No. 48-1 at ¶ 15. On or about July 17, 2020, Dakota Gas submitted a proposal to North Dakota Industrial Commissions, Lignite Research, Development, and Marketing program ("NDIC") to support its naphtha and tar oil overhead refining project. Id. NDIC approved the proposal and agreed to finance the amount requested by Dakota Gas. Id. at ¶ 18.

On December 17, 2020, RT and Dakota Gas entered into a consulting agreement. See Consulting Agreement, Ex. 1, ECF No. 48-1 (pp. 15-19). According to the consulting agreement, RT was set to provide Dakota Gas with "certain technical information" that "may be applicable to a contemplated hydroprocessing unit for

[Dakota Gas's] caustic washed naphtha and tar oil overhead products." Id. In defining the scope of the work and deliverables, the consulting agreement noted that "services, compensation, and other relevant information will be detailed in each Release." Id.

Thereafter and in accordance with the consulting agreement, RT and Dakota Gas executed Work Release Authorization No. 001 ("Work Release 1") on December 17, 2020, with the "Release Completion Date for January 29, 2020 (sic. 2021) or sooner." See Work Release Authorization No. 001, Ex. 1, ECF No. 48-1 (pp. 24-25). RT was required to provide certain deliverables prior to receiving payment from Dakota Gas for their Phase 1. Id. RT produced the requirements of Phase 1 of their agreement. See Dakota Gas Compl., Ex. 1, ECF No. 48-1 at ¶ 24. Dakota Gas was satisfied with Phase 1, which research had been conducted by Southern Research Institute. See Eggen Declaration, Ex. B, ECF No. 52-2.

In January of 2021, Eggen located MATRIC and began discussions related to the on-going project with Dakota Gas. See Eggen Declaration, Ex. B, ECF No. 52-2; Email from R. Eggen to MATRIC's D. Dombek, January 27, 2021, Ex. 3, ECF No. 48-3. RT, in furtherance of its consulting work for Dakota Gas, entered into the contract with MATRIC. See Dakota Gas Compl., Ex. 1, ECF No.

48-1 at ¶ 21.  It was understood by RT and Dakota Gas that MATRIC and RT's fees would be paid, in part, from the NDIC funds obtained by Dakota Gas.  Id. at ¶ 22.  On February 19, 2021, there was a Teams call between MATRIC's Vice President Duane Dombek, RT's Rodman Eggen, and Dakota Gas's Christopher Breiner and Mike Seefeld.  See AVN's Response at Interrog. No. 10, Ex. 18, ECF No. 48-18.  As noted, on February 25, 2021, the services agreement between RT and MATRIC was finalized.  On April 7, 2021, MATRIC informed Eggen that the project had been commenced on March 30, 2021.  See Email from MATRIC's M. Bradford to R. Eggen, Ex. 1, ECF No. 48-7.

Work Release Authorization No. 002 ("Work Release 2") was executed by RT and Dakota Gas on April 19, 2021, and the completion date was set for January 29, 2022, or sooner.  See Work Release Authorization No. 002, Ex. 1, ECF No. 48-1 (pp. 26-29).  The scope of work, as set forth in Work Release 2, establishes that RT and Dakota Gas "will collaborate on a pilot scale test to hydrotreat a mixture of DGC's oil overheads and caustic washed naphtha."  Id.  Further, the scope of work, as set forth in Work Release 2, also provided that "[p]rior to lab testing, MATRIC will provide RT with a statement of experimental objectives, a description of the experimental design, and a project timeline."  Id.

8

MATRIC performed services for RT through May, June, and July of 2021, providing Eggen an ageing report of past due invoices.  See Email from MATRIC's C. Harvey to R. Eggen, July 26, 2021, Ex. 9, ECF No. 48-9.  On July 27, 2021, MATRIC contacted Eggen, noting that upon inspection of the budget for the project it "realized we are essentially at the total estimated cost of $245k" and "will need to execute a change order to cover expenses to complete the project."  See Email from MATRIC's M. Burgess to R. Eggen, July 27, 2021, Ex. 10, ECF No. 48-10.  The next day, on July 28, 2021, Eggen responded that he "was working on a change order."  See Email from R. Eggen to M. Burgess, July 28, 2021, Ex. 10, ECF No. 48-10.

On August 18, 2021, Eggen notified MATRIC that RT was "working with the Dakota people to free up the funds owed to us" and "[i]n the meantime please make sure you have discontinued any activities there that would add to our costs."  See Email from R. Eggen to M. Bradford, August 18, 2021, Ex. 12, ECF No. 48-12.  The outstanding unpaid invoices issued as of August 13, 2021, totaled $204,257.88.  See Email from C. Harvey to E. Eggen, November 22, 2021, Ex. 19, ECF No. 48-19.  On August 23, 2021, Eggen again informed MATRIC that he was "working on the plan we discussed to settle our account and also get the project back on track."  See

Email from R. Eggen to M. Bradford, August 23, 2021, Ex. 13, ECF No. 48-13.

On September 16, 2021, MATRIC notified Eggen that the project had been on hold due to the outstanding invoice remittance issue. <u>See</u> Email from M. Bradford to R. Eggen, September 16, 2021, Ex. 15, ECF No. 48-15. During this time, the project was still incurring costs due to system and lab fee rental. <u>Id.</u> Thereafter on September 17, 2021, Eggen on behalf of RT, instructed MATRIC to "wrap-up the project." <u>See</u> Email from R. Eggen to M. Bradford, September 17, 2021, Ex. 15, ECF No. 48-15.

On September 25, 2021, Dakota Gas informed RT it was terminating the consulting agreement with RT effective October 5, 2021. <u>See</u> Letter from M. Seefeld to R. Eggen, September 25, 2021, Ex. 1, ECF No. 48-1 (p. 30). Nearly seven weeks later, after Dakota Gas's termination letter, Dakota Gas on November 4, 2021, requested that MATRIC submit a proposal regarding Dakota Gas's hydrotreating project. <u>See</u> Email from C. Breiner to J. Dever, November 4, 2021, Ex. 17, ECF No. 48-17. Thereafter on November 15, 2021, MATRIC submitted a proposal in response to Dakota Gas's scope of work, estimating that the investment would be about "$500k." <u>See</u> Email from D. Dombek to C. Breiner, November 15, 2021, Ex. 17, ECF No. 48-17. On December 10, 2021, Dakota Gas emailed MATRIC rejecting the proposal as the "economic investment

will not be justified at this time." See Email from C. Breiner to D. Dombek, December 10, 2021, Ex. 17, ECF No. 48-17.

As of November 22, 2021, the MATRIC ageing report detail displayed an open balance of $229.730.20 due from RT to MATRIC. See Email from C. Harvey to E. Eggen, November 22, 2021, Ex. 19, ECF No. 48-19.

### III. LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts at this stage do not resolve disputed facts, weigh evidence, or make determinations of credibility. See Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995); Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).

Facts are "material" where they are necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Pub'g Co v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine" dispute of material fact exists where, when viewing the record in the light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248. The moving

party bears the burden of establishing the lack of evidence supporting the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In the case that the moving party has met this burden, the non-moving party must then set forth specific facts, admissible in evidence, that prove the existence of a triable issue. See id. at 322-23.

Inferences that "are drawn from the underlying facts ... must be viewed in the light most favorable" to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). A party is entitled to summary judgment if the record could not lead a rational trier of fact to find for the non-moving party. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. "[T]he mere existence of a scintilla of evidence" in favor of the non-moving party's assertions is insufficient to withstand the summary judgment motion. Id. at 252.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)(quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58,

62 n.4 (1st Cir. 1997)).  Additionally, under West Virginia law "it is well recognized that '[t]he interpretation of [a] contract, including the question of whether the contract is ambiguous, is a legal determination . . . .'"  Bruce McDonald Holding Co. v. Addington, Inc., 825 S.E.2d 779, 784 (W. Va. 2019)(alterations in original)(quoting Syl. Pt. 2, Riffe v. Home Finders Assocs., Inc., 517 S.E.2d 313 (W. Va. 1999)).

### IV. ANALYSIS

#### A. RT's Capacity to Defend and Maintain Suit in West Virginia

AVN argues that RT is unable to maintain its claims in this proceeding since it failed to register to do business in West Virginia.  AVN's Mot. Summ. J. at 10.  AVN does not question RT's ability to defend AVN's action against it.  Id.

AVN notes that the project was to "be performed at MATRIC's facilities situated in South Charleston."  MSA, § 1.4. Further, the parties agreed that any actions would be brought in the state of West Virginia.  Id. at § 6.3.  By entering into the services agreement, AVN argues that RT was "transacting business" in the state of West Virginia that required it to register in the state.  AVN's Mot. Summ. J. at 10.  AVN correctly notes that a review of the West Virginia Secretary of State Business & Licensing Business Organization Search shows no record of RT being registered

to do business in West Virginia.  <u>See</u> Business & Licensing Online Data Services, Ex. 21, ECF No. 48-21.

In response, RT alleges that RT hired MATRIC to perform the services and conduct the research, by virtue of which it contends that the transaction between RT and MATRIC occurred within interstate commerce and does not constitute transacting business according to the West Virginia Code.  ECF No. 67 at 5.

The West Virginia statute at issue provides as follows: "[a] foreign limited liability company transacting business in this state may not maintain an action or proceeding in this state unless it has a certificate of authority to transact business in this state."  W. Va. Code Ann. § 31B-10-1008(a).  At the same time the West Virginia Code specifies "Activities of a foreign limited liability company that do not constitute transacting business in this state within the meaning of this article include: (1) Maintaining, defending or settling an action or proceeding ... [and] (10) Transacting business in interstate commerce."  W. Va. Code Ann. § 31B-10-1003(a)(1),(10).

Here, RT, a Texas corporation, entered into a business transaction with West Virginia corporation MATRIC, an activity appearing to fall within the realm of interstate commerce.

14

Inasmuch as the issue raised by AVN with respect to RT's ability to counterclaim under these West Virginia statutes requires both factual development and adequate briefing of the law, ruling on this issue is deferred until trial.

B. <u>RT's Capacity to Sue Under Texas Tax Code § 171.252</u>

AVN first raises the issue of RT's corporate status in its motion for summary judgment, filed January 27, 2025. <u>See</u> AVN's Mot. Summ. J. at 8. AVN argues that inasmuch as the Texas Secretary of State forfeited RT's corporate privileges and its certificate to do business on June 24, 2022, prior to the filing of this lawsuit on February 22, 2023, RT is now deprived of the capacity to sue or defend itself under Texas Tax Code § 171.252. <u>See</u> RT's Charter Forfeiture, Ex. 20, ECF No. 48-20.

In response, RT claims that its corporate privileges were revived according to a "Tax Clearance Letter for Reinstatement" provided by the Texas Comptroller, dated February 10, 2025. <u>See</u> Letter from Tex. Comptroller of Public Accounts, Ex. 14, ECF No. 67-7. AVN contends that a "Tax Clearance Letter" is simply one step in the reinstatement process and does not revive an entity's corporate privileges. <u>See</u> <u>YHR Mason R. Partners, LP v. 7-7 Cleaners, Inc.</u>, No. 01-18-00849-CV, 2020 WL 716732, at *7 (Tex. App. Feb. 13, 2020)(finding that a "Tax Clearance letter" was not sufficient evidence to establish the reinstatement of the

corporation's corporate privileges and that, "[t]here was no evidence in the record" that the Secretary of State "set aside the forfeiture of Cleaner's charter or that Cleaner's corporate privileges were reinstated.")

AVN further argues that even if RT's corporate privileges were revived, RT could only proceed with any defenses and counterclaims for suits "commenced before revocation." <u>See</u> ECF No. 70. Consequently, since RT had no corporate privileges at the time the suit commenced, AVN asserts that the revival of RT's privileges does not alleviate its inability to present a defense under Section 171.252. <u>Id.</u>

On March 3, 2025, RT filed a "Notice of Exhibit Supplement to Summary Judgment Filings" which included a Certificate of Filing from the Texas Secretary of State dated February 25, 2025. <u>See</u> Certificate of Filing, Ex. EE, ECF No. 75-1. The Certificate of Filing in effect sets aside RT's tax forfeiture and reinstates it to "active status on the records of [the Texas Secretary of State]." <u>Id.</u>

"The capacity of a corporation to bring suit is determined by the law of the state where it is organized." <u>Texas Clinical Labs, Inc. v. Leavitt</u>, 535 F.3d 397, 403 (5th Cir. 2008). As a "taxable entity" RT is subject to the Texas Tax Code. TEX. TAX CODE § 171.0002(a). It is undisputed that the comptroller

forfeited RT's corporate privileges; namely, the right to transact business in the state of Texas.  <u>See</u> RT's Charter Forfeiture, Ex. 20, ECF No. 48-20.  It is also clear that RT failed to revive its "forfeited privileges within 120 days after the date that the privileges were forfeited" pursuant to Texas Tax Code § 171.309. Under the Texas Tax Code, the consequences of such a forfeiture are "(1) the corporation shall be denied the right to sue or defend in a court of this state; and (2) each director or officer of the corporation is liable for a debt of the corporation as provided by Section 171.255 of this code."  TEX. TAX CODE § 171.252(1-2).

Where a corporation's charter or certificate of authority has been forfeited, Section 171.313 of the Texas Tax Code provides that "a stockholder, director, or officer of the corporation at the time of the forfeiture ... of the corporate privileges of the corporation may request in the name of the corporation that the secretary of state set aside the forfeiture of the charter or certificate."  TEX. TAX CODE § 171.313.  If a request is made and any delinquent tax, penalty, or interest has been paid, then "the secretary shall set aside the forfeiture of the corporation's charter or certificate of authority."  <u>Id.</u>  Texas Tax Code 171.313 contains no time limitation for setting aside a tax forfeiture.  <u>Id.</u>  If the Secretary of State sets aside the

forfeiture of the charter, the Comptroller will then "revive" the corporate privileges of the corporation. TEX. TAX CODE § 171.314.

"A delinquent corporation [can] revive its privileges and access to the courts" by securing reinstatement of its corporate charter through payment of its delinquent franchise taxes. <u>Speier Tire Co., Inc. v. Tom Benson Chevway Rental and Leasing, Inc.</u>, 643 S.W.2d 772 (Tex. App. 1982, writ ref'd n.r.e.). AVN cites to <u>Speier Tire</u> where the appellant initiated its suit on June 30, 1976, and subsequently had its charter forfeited by the Texas Secretary of State on March 13, 1978. <u>Id.</u> at 773. In <u>Speier Tire</u> the court held that because appellant had obtained reinstatement of its charter by paying off the delinquent franchise taxes it had "standing to proceed with the suit commenced before the revocation." <u>Id.</u> Here, AVN points the court to the timing of the revocation, arguing that the phrase "suit commenced before revocation" suggests RT cannot sue or defend on any claims filed after its revocation. ECF No. 70.

In reaching its conclusion the <u>Speier Tire</u> court adhered to <u>ACME Color Art Printing</u>, where the court held "[a]llowing a corporation to proceed with a suit commenced before reinstatement of its charter is consistent with the enforcement provisions of the franchise tax statute." <u>ACME</u>, 488 S.W.2d at 508. Ultimately in <u>ACME Color Art Printing</u>, the court concluded that "[s]ince

plaintiff showed that its charter had been reinstated before the hearing, it had standing to proceed with the suit, regardless of whether it had such standing on March 28, 1972, when the petition was filed." Id. Indeed, there is ample authority, as set forth below, that refutes AVN's argument that RT's reinstatement after the filing is not sufficient to regain access to the courts.

"Once the corporation pays the delinquent taxes and is reinstated, the payment relates back and revives the corporate rights that were forfeited." Flameout Design and Fabrication, Inc. v. Pennzoil Capsian Corp., 994 S.W.2d 830, 839 (Tex. App. 1999, no pet.); See Mello v. A.M.F. Inc., 7 S.W.3d 329, 331 (Tex. App. 1999, pet. denied)(corporation's corporate privileges and charter are retroactively reinstated upon filing of delinquent reports and payment of delinquent franchise taxes).

Under Texas law, the purpose of Section 171.252 "is to enforce collection of state franchise taxes, not to prohibit a corporate cause of action." Bradley J. Fish, Inc. v. Lesar Elec. & Design LLC, No. 01-19-00064-CV, 2020 WL 4589758, at *4 (Tex. App. 2020)(citing Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp., 994 S.W.2d 830, 839 (Tex. App. 1999, no pet.)) In Bradley J. Fish the court concluded that since Lesar had provided evidence "showing that it had paid its tax debt and had applied to have its corporate privileges reinstated while its suit was pending

in the trial court" the payment of the taxes related back to the filing of the lawsuit. Bradley J. Fish, 2020 WL 4589758, at *1. Accordingly, once a corporation "rehabilitates itself and is reinstated under Texas law, the policy of the law is not to punish the corporation, but rather the law is intended to encourage the corporation to pay its taxes." Bluebonnet Farms, Inc. v. Gibraltar Sav. Ass'n, 618 S.W.2d 81, 85 (Tex. App. 1980, writ ref'd n.r.e.); See also Acme Color Art Printing Co. Inc., v. Brown, 488 S.W.2d 507 (Tex. App. 1972, writ ref'd n.r.e.)("[t]he sole purpose of the statute is to raise revenue, and that purpose is best served by encouraging a delinquent corporation to obtain revival of its privileges and access to the courts by paying the amount due the state.")

    In G. Richards Goins Const. Co., Inc. v. S.B. McLaughlin Assocs., Inc., 930 S.W.2d 124 (Tex. App. 1996, writ denied), the court held that upon payment of delinquent taxes a "corporation's disability is removed, and the corporation may sue and defend in Texas state courts." The court emphasized that "[o]nce the right to sue or defend is revived, the corporation may sue or defend all causes of action, regardless of whether such causes arose before or during the period of forfeiture." Id.

    Similarly, in Highline Innovation Invs. P'ship, LLC v. Biolert, Ltd., No. 4:21-CV-00615, 2022 WL 3354775, at *5 (E.D.

Tex. Aug. 12, 2022) the court held that in recovering its charter, the corporation's right to sue related back to the date it forfeited its corporate privileges.  The <u>Highline</u> lawsuit was initiated by Highline on November 16, 2021, though Highline had earlier forfeited its corporate privileges on or around April 20, 2021, after failing to pay its state franchise tax, following which the Texas Secretary of State forfeited Highline's corporate charter on August 20, 2021.  <u>Id.</u> at *4.  Highline's charter was reinstated by the Secretary of State on December 1, 2021.  <u>Id.</u> The court held that Highline's right to sue related back to April 20, 2021, and thus Highline did "not lack capacity to litigate this matter."  <u>Id.</u> at *5.  <u>See also</u> <u>Hinkle v. Adams</u>, 74 S.W.3d 189, 194 (Tex. App. 2002, no pet.)(even though reinstatement of the medical center occurred after the patient's visit, the secretary of state's reinstatement operated retroactively; inasmuch as the corporation had "reinstated its charter, it is as though the forfeiture never existed"); <u>NexBank SSB v. Bank Midwest, N.A.</u>, No. 3:12-CV-1882, 2012 WL 4321750, at *2 (N.D. Tex. Sept. 21, 2012)("But even taking judicial notice of the fact that Bank Midwest was not in good standing as of the date it filed its counterclaims, this does not demonstrate that Bank Midwest *currently* is not in good standing[...][b]ecause the reinstatement of rights is retroactive [and Bank Midwest's] status relates back to the point of delinquency...")(emphasis in original).

The court concludes that RT's later reinstatement on February 25, 2025, relates back to the date of forfeiture on June 24, 2022, reviving the corporate privileges that were forfeited. Accordingly, the court finds that RT does not lack the capacity to sue or defend in this matter.

## C. AVN's Claim Against Eggen Under Texas Tax Code § 171.252(2)

AVN alleges that since RT forfeited its corporate privileges, Eggen as an officer of RT bears personal liability under Texas Tax Code Section 171.252(a). The court has already determined that RT's corporate privileges have been reinstated; however, the court will consider whether there were any debts incurred during the "relevant window of forfeiture," limited as set forth in the statute quoted next below, that may be attributable to Eggen. See Segarra v. Implemetrics Inc., No. 4:13-CV-217, 2013 WL 5936602, at *3 (S.D. Tex. Nov. 5, 2013).

Section 171.252(a) provides that "each director or officer of the corporation is liable for the debt of the corporation as provided by Section 171.255 of this code" where corporate privileges have been forfeited. Section 171.255 provides in relevant part:

> "If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the

> corporation that is created or incurred in this
> state <u>after</u> the date on which the report, tax, or
> penalty is due <u>and before</u> the corporate privileges
> are revived. The liability includes liability for
> any tax or penalty imposed by this chapter on the
> corporation that becomes due and payable after the
> date of forfeiture."

TEX. TAX CODE § 171.255(a)(underlining supplied).

A "debt" is "any legally enforceable obligation in a certain amount of money which may be performed or paid within an ascertainable period of time or on demand." <u>Williams v. Adams</u>, 74 S.W.3d 437, 440 (Tex. App. 2002). Texas courts have asserted that "contractual debts are incurred when the parties entered into the agreement, regardless of the date of eventual default or judgment." <u>See</u> <u>Segarra</u>, 2013 WL 5936602, at *3; <u>see</u> <u>also</u> <u>Beesley v. Hydrocarbon Separation, Inc.</u>, 358 S.W.3d 415, 422–23 (Tex. App. 2012); <u>Rogers v. Adler</u>, 696 S.W.2d 674, 677 (Tex. App. 1985); <u>Curry Auto Leasing, Inc. v. Byrd</u>, 683 S.W.2d 109, 112 (Tex. App. 1984).

Here, the court finds that RT's debt was created or incurred on February 25, 2021, when the services agreement was signed. RT's charter was not forfeited until June 24, 2022. Inasmuch as it is not shown that RT incurred debts during the relevant window of forfeiture, Eggen is not personally liable under Texas Tax Code Section 171.255.

D. <u>AVN's Breach of Contract Claim & RT's Breach of Contract Counterclaim</u>

"A claim for breach of contract requires proof of the formation of a contract, a breach of the terms of that contract, and resulting damages." <u>Sneberger v. Morrison</u>, 776 S.E.2d 156, 171 (W. Va. 2015). Thus, a plaintiff's breach of contract claim should adequately "allege facts sufficient to support the following elements: the existence of a valid, enforceable contract; that the plaintiff has performed under the contract; that the defendant has breached or violated its duties or obligations under the contract; and that the plaintiff has been injured as a result." <u>Exec. Risk Indem., v. Charleston Area Med. Ctr., Inc.</u>, 681 F.Supp.2d 694, 714 (S.D. W. Va. 2009)(citing 23 Williston on Contracts § 63.1 (Richard A. Lord, ed. 4th ed. West 2009)).

AVN alleges that it is entitled to summary judgment because MATRIC performed under the contract and invoiced its fees and expenses to RT, who has failed to deliver payment, thereby breaching the contract. <u>See</u> AVN's Mot. Summ. J.

RT counterclaims that MATRIC breached the contract by failing to timely and appropriately complete the services contracted for under the MSA. <u>See</u> RT's Mot. Summ. J. RT concedes that the services agreement did not guarantee results from the

project; however, RT emphasizes that MATRIC never completed the research. <u>See</u> ECF No. 69 at 3. Further, RT, pointing to the reports provided by MATRIC regarding the status of the research, alleges that the research conducted by MATRIC was "fraught with problems that had nothing to do with the substantive research and everything to do with MATRIC'S inadequacies." <u>Id.</u> at 4; <u>See</u> "Research Technologies Update", Ex. L, ECF No. 56-9. Specifically, RT says that "MATRIC faced numerous delays, had poor temperature control, "questionable runs" during testing, a leak in the system that invalidated some results, problems with interference during testing, and was unable to complete the project in the promised 3.5-month time span." <u>Id.</u> at 3. RT asserts that the leaks were due "to equipment that was not properly functioning such that fittings needed to be replaced, gas monitors had issues, and air was in the system." <u>Id.</u> Finally, RT maintains that estimates do not constitute "a blank check to more than double the time and cost for a project as set forth in a contract." <u>See</u> ECF No. 69 at 4.

## I.    <u>Expert Testimony – Rule (26)(a)(2)</u>

AVN alleges that it is entitled to summary judgment on RT's counterclaim for breach of contract. AVN's Resp. at 10. AVN argues that because RT failed to present expert testimony, RT cannot prove that MATRIC failed to perform its research services

under the contract. Id. at 12. Specifically, AVN argues that RT is required to present expert testimony to support its counterclaim because (1) the parties knew that MATRIC would be engaging in "complex, novel, and exploratory research" and (2) RT is calling "into question the adequacy of the process employed by MATRIC." Id. Since RT did not disclose the identity of an expert witness in its expert disclosures, AVN argues, RT cannot establish its counterclaim that MATRIC failed to properly conduct its services. Id.

Rule 26(a)(2) of the Federal Rules of Civil Procedure governs the disclosure of expert opinions, requiring parties to disclose their identified experts according to the court's deadline. Fed. R. Civ. P. (a)(2). The disclosure of an expert must be accompanied by a written report. Id. The Fourth Circuit has emphasized that "Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses." Saudi v. Northrop Grumman Corp., 427 F.3d 271, 278-79 (4th Cir. 2005). A "party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case." Id.

When a party fails to comply with Rule 26(a) and neglects to "provide information regarding an expert witness or to identify

that witness, the penalty is exclusion" of the expert.  Scraggs v. NGK Spark Plugs (U.S.A.) Inc., No. 2:15-cv-11357, 2016 WL 2851567, at *2 (S.D. W. Va. May 13, 2016)(citing Fed. R. Civ. P. 37(c)(1)).  "[W]e give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)."  Saudi 427 F.3d at 278-279 (S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595 (4th Cir. 2003)).

On March 11, 2024, the court entered a scheduling order, which established the deadline of August 1, 2024, for expert witness disclosures for parties bearing the burden of proof.[1]  See ECF No. 21.  On August 1, 2024, RT, who bears the burden of proof on its counterclaims, filed its opening Rule 26(a)(2) expert disclosure noting that "Defendants have no expert(s) to disclose at this time."  See ECF No. 69-2.  AVN did not file an opening Rule 26(a)(2) expert disclosure.

Thereafter, on September 3, 2024, AVN filed "AVN Corporation's Rule 26(A)(2) Disclosures" with respect to "any of the claims (and defenses thereto) made in the counterclaims brought by" RT.  See ECF No. 69-3.  In its disclosure AVN identifies nine

---

[1] Then on September 23, 2024, the court granted a joint motion filed by the parties to modify the court's scheduling order, the amendment commencing with the date discovery is to close.  ECF No. 46.  This joint motion came after the deadline for disclosing experts for the parties bearing the burden of proof, the deadline for which was not extended.

individuals as experts.  <u>Id.</u>  AVN does not provide an expert report regarding any of the nine individuals.

On September 16, 2024, RT identified Rodman Eggen as a rebuttal expert witness.  <u>See</u> ECF No. 69-4.  RT did not provide an expert report.

Inasmuch as RT has conceded that the substantive research process employed by MATRIC is not in issue, there appears to be no need for expert testimony.  Moreover, no export report has been provided by any party.  AVN has identified nine experts, most of whom appear to be affiliated with the project at issue in this case.  But no expert report has been filed for any of them.

In response, RT has offered its co-defendant Rodman Eggen as a rebuttal expert although also without providing an expert report.

Accordingly, no expert testimony on the basis of scientific, technical, or other specialized knowledge within the scope of Rule 702 of the Federal Rules of Evidence is available or anticipated at trial.

## II.  <u>The Masters Service Agreement</u>

Eggen provides a sworn declaration, executed on January 25, 2025, pursuant to 28 U.S.C. § 1746.  <u>See</u> Eggen Declaration,

Ex. B, ECF No. 52-2.  In his declaration Eggen asserts that MATRIC affirmatively represented that it had the requisite expertise and equipment and that it could begin the project right away.  Id.

Pursuant to Section 1.1 of the Masters Service Agreement, it is provided that "RT hereby engages MATRIC to provide the Services described in the attached SOW."  MSA, § 1.1.  The SOW refers to the work thereunder as "Phase 1."  SOW at 1.  MATRIC was set to carry out research in support of RT's intention to "evaluate the performance of several hydrotreating catalysts for processing a liquid byproduct obtained from a coal gasification source."  Id. at 2.  Additionally, the SOW establishes that "MATRIC will perform this project on a time and materials basis."  Id. at 4.  The SOW indicates that the duration of the project would be three and a half months for an estimated cost ranging between $210,000 and $245,000.  Id.

The Masters Service Agreement provides:

> RT acknowledges that the Services undertaken by MATRIC, at the solicitation of RT, are in the nature of complex research and development activities which are exploratory and may be of novel pursuit involving unknown technical risks. In research and development, negative results are also deemed valuable results. As such, RT recognizes and accepts that MATRIC's provision of the Services and its associated deliverables include the inherent risk of uncertainty in outcome.

Masters Service Agreement, § 1.2.

29

Section 1.2 of the MSA also provides in relevant part:

> RT may request, or MATRIC may propose, in writing, changes to the Services. MATRIC will submit a report to RT setting forth the effect, if any, of the change(s) requested by RT or proposed by MATRIC on function, performance, reliability, schedule, costs, prices, delivery or other relevant criteria in relation to the Services.

Masters Service Agreement, § 1.2.

Further, the SOW attached to the MSA sets forth the cost and timing summary:

> Based on this average monthly cost, the estimated costs for the major project activities can be estimated, assuming that the objectives of Phase 1 can be completed in two months. The initial test of Phase 1 will require Project Set-Up and consists of two tests to be conducted over an approximate two-week period Documentation for this initial test will include product analytical data and hydrogen consumption only. If more time is required to complete these objectives, work may continue with approval of RT.

Statement of Work #2021-01, at ¶ C.

Under the Masters Service Agreement, RT agreed to "pay to MATRIC the Fees for the Services to be rendered hereunder as set forth in the SOW." MSA, § 2.1. The "Fees" were to be "payable within thirty (30) days of the date of bi-weekly invoices to RT from MATRIC" and specific to "the hours spent by MATRIC in performance of the Services." Id.

MATRIC and RT, under the Masters Service Agreement, agreed that termination between the parties would proceed as follows:

> Either Party holds the right to terminate this Agreement in the event: (a) of any breach of this Agreement by the other Party; (b) or failure of MATRIC to perform the Services in keeping with RT's reasonable standards, that goes uncorrected for a period of twenty (20) business days after notice of same, setting forth the relevant details of such non-performance with reasonable particularity; (c) of the institution by or against the other Party of voluntary or involuntary proceedings in bankruptcy or under any insolvency law or law for the relief of debtors; or (d) that the other Party passes a resolution for winding up its business (other than for the purpose of amalgamation or restructuring). In addition, RT may terminate this Agreement, without cause and without penalty, for any reason, upon notice to MATRIC.

Masters Service Agreement, § 5.1.

In the event that the services agreement was terminated, MATRIC was entitled to payment or recovery of Fees that were unpaid by RT prior to the date of termination with respect to work earned and conducted in compliance with the terms of the agreement. MSA, § 5.2.

Here, the parties do not dispute that the services agreement governs the parties' duties in this matter. RT exercised its right to terminate the project under the services agreement that permitted RT to end the project without cause at any time for any reason. See MSA, § 5.1.; Email from R. Eggen to M. Bradford,

September 17, 2021, Ex. 15, ECF No. 48-15.  The question remains as to whether MATRIC's performance during the period prior to RT's termination constitutes a breach on the part of MATRIC.

The services agreement explicitly sets forth that the research to be conducted "may be of novel pursuit involving unknown technical risks."  MSA, § 1.2.  The services agreement recognizes that the costs for the research were estimates that could fluctuate depending on the progress of the research as where "more time is required to complete these objectives, work may continue with approval of RT."  SOW at 4.  The communications between the parties reflect this, as Eggen acknowledged through an email to MATRIC that a change order to cover expenses to complete the project may be required.  See Email from R. Eggen to M. Burgess, July 28, 2021, Ex. 10, ECF No. 48-10.

The record reveals that RT and MATRIC were in consistent communication, and at no point does RT express to MATRIC that RT was dissatisfied with MATRIC's progress or that MATRIC was not complying with RT's reasonable standards.  RT does not provide any evidence that MATRIC was on notice regarding dissatisfaction on RT's part with the project's progress.  Instead, RT continued to accept and engage MATRIC's services under the services agreement and RT continued to incur costs therefor as outlined below.

As early as July 27, 2021, RT was on notice that the budget for the project required the execution of a change order to cover the expenses needed to complete the project.  Indeed, RT told MATRIC that RT was working on a change order.  <u>See</u> Email from M. Burgess to R. Eggen, July 27, 2021, Ex. 10, ECF No. 48-10.  On August 18, 2021, RT first indicated to MATRIC that the activities of the project should be discontinued for the time being.  <u>See</u> Email from R. Eggen to M. Bradford, August 18, 2021, Ex. 12, ECF No. 48-12.  Bradford responded, acknowledging that the project was on hold but that RT "will still be accruing lab rental fees, potential waste disposal fees" and if the project is discontinued there will be decommissioning costs as set forth in the services agreement.  <u>See</u> Email from M. Bradford to R. Eggen, August 20, 2021, Ex. 12, ECF No. 48-12.  Three days later RT assured MATRIC that it was working on settling the account and getting the project back on track.  <u>See</u> Email from R. Eggen to M. Bradford, August 23, 2021, Ex. 13, ECF No. 48-13.

Notably, on August 9, 2021, Eggen had contacted MATRIC inquiring whether sharing the data with Dakota Gas contained in the "Research Technologies Analytical" dated August 6, 2021, would be appropriate under RT's agreements with MATRIC.  <u>See</u> Email from R. Eggen to M. Bradford, August 9, 2021, Ex. 11, ECF No. 48-11.  Bradford approved RT's request to present the data to Dakota Gas,

33

but reminded Eggen that the data continues to be MATRIC's property until RT's invoices are remitted in full. Id. It was not until September 17, 2021, that RT directed MATRIC to terminate the project. See Email from R. Eggen to M. Bradford, September 17, 2021, Ex. 15, ECF No. 48-15.

Eggen's declaration that MATRIC promised certain expertise and equipment, and that it could begin the project right away during communications prior to the signing of the services agreement does not detract from the services agreement. "[W]here the terms of a written instrument are unambiguous, clear, and explicit, extrinsic evidence of statements of any of the parties to it made contemporaneously with or prior to its execution is inadmissible to contradict, add to, detract from, vary or explain its terms, in the absence of fraud, accident or mistake in its procurement." Kanawha Banking & Trust Co. v. Gilbert, 46 S.E.2d 225, 232-233 (W. Va. 1947). However, the court notes that the SOW includes the following provision in relevant part:

> MATRIC staff have carried out previous work on liquid phase hydrotreating. Laboratory facilities are available to support the envisioned work.

Statement of Work #2021-01, at ¶ A.

Further, the SOW estimated the duration of the project would be three and a half months with the project set-up consisting

of a month, the catalyst testing consisting of two months, and the documentation and decommissioning lasting two weeks.  SOW at 4.

RT points the court to delays produced by leaks and the lack of temperature control due to non-functioning equipment causing the project to be shut down.  See Email from M. Burgess to R. Eggen, June 25, 2021, Ex. AA, ECF No. 71-4.  It is evident that there was a total of seven weeks of delay in the project.  See Email from M. Burgess to R. Eggen, August 24, 2021, Ex. G, ECF No. 56-4.  The reasons for the seven weeks of delay were provided by MATRIC to RT, along with the length of delay for each item, which included: 1) Dakota reevaluating direction of project, two weeks; 2) modifications from PSSR, one week; 3) discovered SMSO could not be used for sulfiding, switched to SulfrZol-54, one week; 4) leak at top of RX215, one week; 5) N2 cylinder went empty allowing backflow of feed to cylinder, modifications and mini-committee review, one week; 6) "Bad" CO value on area monitor, mini-committee review to remove CO from ESD matric, 0.5 weeks; 7) developed leak, repaired lead, shutdown awaiting funding, 0.5 weeks.  Id. Additionally, on March 19, 2021, Michael Bradford, the Director of Research at MATRIC, sent an internal email stating that the system used to conduct the research would "require some material purchases" and "shakedown testing with some clean material to ensure system functionality (it's been idle for almost 1 year)."

See Email from M. Bradford to D. Dombek, March 19, 2021, Ex. BB, ECF No. 71-5.

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Here, in viewing in the light most favorable to RT, the court concludes that RT has created a genuine issue of material fact regarding MATRIC's delay in performance. While this seems limited to RT's contention that MATRIC may have lacked the appropriate equipment in workable condition, thereby leading to problems with testing and delays in the progress of the project, the issue raised is one for the trier of fact to resolve. Consequently, AVN's motion for summary judgment on its breach of contract claim is DENIED. For the same reason RT's counterclaim on its breach of contract claim is also DENIED.

### E. RT's Claim against AVN for Tortious Interference

The elements of a claim for tortious interference with a contract or business relationship are the (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. See Torbett v. Wheeling Dollar Sav. & Trust, 314 S.E.2d 166, 171-173 (W. Va. 1983).

The intentional act must have been made with intention by the actor. See <u>Arthur-Nelson v. U.S. Bancorp Gov. Leasing & Fin. Inc.</u>, No. 1:19-CV-167, 2020 WL 5822211, at *10 (N.D. W. Va. Sept. 30, 2021)(quoting Restatement (Second) of Torts 766 cmt. H (June 2020 Update))("The essential thing is to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other."). "Defendants are not liable for interference that is negligent rather than intentional..." <u>Hatfield v. Health Management Associates of West Virginia</u>, 672 S.E.2d 395, 403 (W. Va. 2008).

Breach of contract alone is insufficient to establish tortious interference. <u>DLB Enterprises LLC v. Kanawha Stone Co., Inc.</u>, No. 2:22-CV-00046, 2022 WL 2679457, at *4 (S.D. W. Va. July 11, 2022). In <u>DLB Enterprises</u>, Kanawha Stone alleged that through its "repeated breaches" of the subcontract, including timeliness and quality of work, DLB Enterprises intentionally interfered with Kanawha Stone's business relationship with a third party. <u>Id.</u> The court noted that these issues were devoid of any inference regarding intent. <u>Id.</u> The court, in viewing the evidence, found nothing that would "show or allow" an inference that DLB

Enterprises acted with intent to interfere with Kanawha Stone's business relationship with a third party. Id.

RT alleges that MATRIC's delayed performance coupled with what it describes as MATRIC's immediate proposal to Dakota Gas after RT terminated the services agreement was an intentional interference with RT's business relationship with Dakota Gas. See ECF No. 69 at 6. In response, AVN persuasively contends there is no evidence of intentional acts committed by MATRIC meant to interfere with RT's relationship with Dakota Gas. See ECF No. 63 at 18.

The court finds that RT's claim that MATRIC's nonperformance under the services agreement as well as its later communications with Dakota Gas do not affirmatively establish an intentional act of interference. First, a breach of contract does not itself establish tortious interference, meaning MATRIC's alleged non-performance would not alone constitute tortious interference.

Second, the timeline works to dispel concerns about intentional interference on behalf of MATRIC. For one, it was Dakota Gas that initiated the communications with MATRIC about submitting a proposal. MATRIC simply responded to the request. Further, MATRIC could not have tortiously interfered with a contract that did not exist inasmuch as the consulting agreement

between Dakota Gas and RT had already ended on October 5, 2021, whereas Dakota Gas did not begin the communications with MATRIC until November 4, 2021, by requesting a proposal from MATRIC. See Email from C. Breiner to J. Dever, November 4, 2021, Ex. 17, ECF No. 48-17. There is also no indication that the communications between MATRIC and Dakota Gas were in any way connected to Dakota Gas' prior termination of RT's consulting agreement with Dakota Gas. Additionally, RT presents no evidence that the relationship between RT and Dakota Gas was set to continue. Indeed, it was not long until RT filed its complaint against Dakota Gas in North Dakota on May 23, 2022. The record is thus devoid of evidence that MATRIC engaged in tortious acts with the intent to interfere with the business relationship between RT and Dakota Gas. Consequently, RT's motion for summary judgment on its tortious interference claim is DENIED and AVN's like motion on that same claim is GRANTED.

### F. AVN's Claim Against Eggen for RT's Breach of Contract

Under West Virginia law, the approach in determining whether to pierce the corporate veil includes consideration of both a disregard of formalities requirement and a fairness requirement:

To pierce the veil of a limited liability company in order to impose personal liability on its member(s) or manager(s), it must be established that (1) there exists such unity of interest and ownership that the separate personalities of the business and of the individual member(s) or managers(s) no longer exist and (2) fraud, injustice, or an inequitable result would occur if the veil is not pierced.

Kubican v. The Tavern, LLC, 752 S.E.2d 299, 301 (W. Va. 2013).

The Supreme Court of Appeals of West Virginia has set forth nineteen factors that courts may consider when assessing whether the corporate veil should be pierced. Laya v. Erin Homes, Inc., 352 S.E.2d 93, 98 (W. Va. 1986)).[2] "[G]rossly inadequate

---

[2] Some of the factors to be considered in deciding whether to pierce the corporate veil are:

(1) comingling of funds and other assets of the corporation with those of the individual shareholders; (2) diversion of the corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders); (3) failure to maintain the corporate formalities necessary for the issuance of or subscription to the corporation's stock, such as formal approval of the stock issue by the board of directors; (4) an individual shareholder representing to persons outside the corporation that he or she is personally liable for the debts or other obligations of the corporation; (5) failure to maintain corporate minutes or adequate corporate records; (6) identical equitable ownership in two entities; (7) identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties); (8) failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking; (9) absence of separately held corporate assets; (10) use of a corporation as a mere shell or conduit to operate a single venture or some particular aspect of the business of an individual or another corporation; (11) sole ownership of all the stock by one individual or members of a single family; (12) use of the same office or business location by the corporation and its individual shareholder(s); (13) employment of the same employees or attorney by the corporation and its shareholder(s); (14) concealment or misrepresentation of the identity of the ownership, management or financial interests in the corporation, and concealment of personal business activities of the shareholders (sole shareholders do not reveal the association with a corporation, which makes loans to them without adequate security); (15) disregard of legal formalities and failure to maintain proper arm's length relationships among related entities; (16) use of a corporate entity as a conduit to

capitalization is a very important factor" under the fairness requirement. <u>Id.</u> at 101. In <u>Laya</u>, the court recognized that "grossly inadequate capitalization combined with a disregard of corporate formalities, causing basic unfairness, are sufficient to pierce the corporate veil in order to hold the shareholder(s) actively participating in the operation of the business personally liable for a breach of contract to the party who entered into the contract with the corporation." <u>Id.</u> at 101-102. "One fact which all the authorities consider significant in the inquiry" of piercing the corporate veil "is whether the corporation was grossly undercapitalized for the purposes of corporate undertaking." <u>DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.</u>, 540 F.2d 681, 685 (4th Cir. 1976).

In <u>Laya</u> the court made clear that the "propriety of piercing the corporate veil should rarely be determined upon a motion for summary judgment" but "[i]nstead, the propriety of piercing the corporate veil usually involves numerous questions of fact for the trier of the facts to determine upon all of the

---

procure labor, services or merchandise for another person or entity; (17) diversion of corporate assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities to concentrate the assets in one and the liabilities in another; (18) contracting by the corporation with another person with the intent to avoid the risk of nonperformance by use of the corporate entity; or the use of a corporation as a subterfuge for illegal transactions; (19) the formation and use of the corporation to assume the existing liabilities of another person or entity.

evidence." <u>Laya</u>, 352 S.E.2d at 102. <u>See also</u> <u>Dailey v. Ayers</u>
<u>Land Dev., LLC</u>, 825 S.E.2d 351, 362 (W. Va. 2019)("based on the
record before us and given our express recognition of the fact-
based nature of determining whether to 'pierce the veil,' we find
this issue is a matter for the jury...")

AVN alleges that Eggen is liable for RT's breach of
contract as, it contends, there is sufficient evidence to pierce
the corporate veil. <u>See</u> ECF No. 64 at 5. AVN argues that RT's
bank statements reveal that it was "grossly undercapitalized"
during the time it negotiated with MATRIC as it only had $1,262.74
in the bank. <u>See</u> ECF No. 64 at 5; RT Bank Statement, Ex. 6, ECF
No. 50-3. AVN asserts that Jon Burmeister, legal counsel for RT,
informed MATRIC that RT did not have money or assets. <u>See</u> AVN's
Response at Interrog. No. 5, Ex. 18, ECF No. 48-18. Consequently,
AVN argues, Eggen who AVN describes as the Director of Engineering
and Managing Member, was certainly aware of RT's bank balances and
finances. <u>See</u> ECF No. 64 at 4. AVN asserts that such evidence
allows the piercing of the corporate veil. <u>Id.</u> at 5.

Eggen, in a sworn declaration, states that (1) his
discussions with MATRIC were conducted in his capacity as Director
of Engineering and not as an individual and (2) he "did not, in
any way, infer, imply, state, or otherwise claim" that RT had all
the funds in the bank account or upfront. <u>See</u> Eggen Declaration,

Ex. B, ECF No. 52-2.  The documents signed by Eggen, specifically the Masters Service Agreement and the Statement of Work #2021-01 have been signed with the title of RT's Director of Engineering. <u>See</u> Ex. E, ECF No. 56-2; Ex. F, ECF No. 56-3.

Under the fairness factor, the court considers AVN's undercapitalization argument.  RT had $1,262.74 in the bank when it engaged MATRIC for the research project.  <u>See</u> RT Bank Statement, Ex. 6, ECF No. 50-3.  The research project was estimated to cost between $210,000 and $245,000.  SOW at 4.  RT remitted only four payments to MATRIC totaling $42,320.15, between May 6, 2021, and June 26, 2021.  <u>See</u> RT's Answer and Resps. to Discovery Requests, Ex. R, ECF No. 68-3.

Under the disregard of formalities requirement AVN appears to argue, although it is unclear to what extent, that Eggen is individually liable because he acted on behalf of RT.  AVN does not point to facts that indicate RT and Eggen failed to follow corporate formalities.  <u>See</u> <u>Dewitt</u>, 540 F.2d at 687 (the decision "to disregard the corporate entity may not, however, rest on a single factor, whether undercapitalization, disregard of corporation's formalities, or what-not, but must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness.")

43

Based on the evidence, and the fact-driven analysis necessary to pierce the corporate veil, summary judgment is not appropriate inasmuch as only one of the nineteen factors noted above have been addressed by AVN. The court finds genuine issues of fact remain as to whether piercing the corporate veil can be justified. AVN's motion for summary judgment on this claim is DENIED.

G. <u>AVN's Claim Against Eggen for Fraudulent Inducement</u>

Under West Virginia law, in order to prove fraudulent inducement, a plaintiff must prove the following elements: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." <u>The Traders Bank v. Kollar, Civ</u>. No. 6:07-cv-00178, 2008 WL 746693, at *3 (S.D. W. Va. Mar. 18, 2008)(quoting <u>Horton v. Tyree</u>, 139 S.E. 737, 738 (W. Va. 1927)).

The Supreme Court of Appeals of West Virginia has concluded that "an officer of a corporation may be personally liable for the tortious acts of the corporation, including fraud, if the officer participated in, approved of, sanctioned, or ratified such acts." <u>Bowling v. Anstead Chrysler-Plymouth-Dodge,</u>

44

Inc., 188 W.Va. 468, 469, 425 S.E.2d 144, 145 (1992). The officer, in sanctioning a fraudulent act, "need not have actual knowledge because constructive knowledge may suffice." Id. Such knowledge does not have to be proven through direct evidence but may be shown by circumstantial evidence. Id.

AVN alleges that Eggen misled MATRIC into believing that it was adequately funded when Eggen knew that RT's funding was dependent on Dakota Gas. See ECF No. 64. Further, Eggen continued to engage MATRIC in providing services knowing RT could not pay. Id. AVN concedes that MATRIC was aware of Dakota Gas's involvement in the project but nevertheless contends that MATRIC was unaware that RT was entirely reliant on Dakota Gas for funding. Id. at 8. AVN asserts that "MATRIC would not have agreed to perform any services for RT" and would not have incurred significant unpaid costs if "it had known that RT was without assets and, but for contingent funding by Dakota," could not pay under the services agreement. See AVN's Response at Interrog. No. 5, Ex. 18, ECF No. 48-18. Specifically, AVN emphasizes that legal counsel for the defendant, Jon Burmeister, informed MATRIC that RT did not have any money or assets. Id.

Eggen, in his sworn declaration, states that he never relayed to MATRIC that RT had the funds to pay for the research already in the bank. See Eggen Declaration, Ex. B, ECF No. 52-2.

He notes that during discussions with MATRIC he made it clear that RT had initial funds, and that later funds would depend upon receipt of funds from Dakota Gas.    Id.

It is unclear (1) whether Eggen ever made a false statement pertaining to MATRIC's funding; (2) the extent of RT's assets; and (3) whether MATRIC was aware of RT's dependence on Dakota Gas's financial involvement in the project.    In view of these disputed matters, AVN's motion for summary judgment as to fraudulent inducement cannot be granted.

H. Rodman Eggen's Motion for Summary Judgment

AVN seeks relief against defendant Eggen on its breach of contract claim grounded on piercing the corporate veil of RT and on its fraudulent inducement claim.    Eggen seeks dismissal of both those counts as to him.

By virtue of the foregoing discussion indicating the existence of genuine issues of material fact with respect to the claims for which Eggen seeks dismissal, the court concludes that Eggen's motion for summary judgment should be DENIED.

<u>V. CONCLUSION</u>

Accordingly, it is ORDERED that:

1. AVN'S Motion for Summary Judgment (ECF No. 48) for its breach of contract action against RT is DENIED;

2. AVN's Motion for Summary Judgment (ECF No. 48) for its fraudulent inducement action against Rodman Eggen is DENIED;

3. RT's Motion for Summary Judgment (ECF No. 54) for its counterclaim based on breach of contract and on tortious interference is DENIED;

4. AVN's Motion for Summary Judgment (ECF No. 48) on RT's counterclaim for tortious interference is GRANTED;

5. Rodman Eggen's Motion for Summary Judgment (ECF No. 52) is DENIED as to the claims by AVN against him.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: May 29, 2025

John T. Copenhaver, Jr.
Senior United States District Judge

47